**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

UNITED STATES OF AMERICA,

Plaintiff,

v.

IRIS M. ÁLVAREZ,

Defendant.

CRIM. NO.: 25-521 (FAB-MEL)

**OPINION AND ORDER**

## I. INTRODUCTION

On April 6, 2026, Defendant Iris M. Álvarez ("Álvarez") was charged via information with four counts of theft of government property under 18 U.S.C. § 641. The information alleges that on four occasions she did not render proper payment for merchandise sold at the Army and Air Force Exchange Service (the "AAFES" or the "Exchange") at Fort Buchanan in San Juan, Puerto Rico. Pending before the court is a portion of Álvarez's Motion to Suppress evidence. ECF No. 37. Álvarez seeks suppression of "all physical items seized during" her allegedly unlawful detention by loss prevention and Department of the Army police officers at the AAFES on the date of the final alleged theft, July 3, 2025, as well as "all statements made" and "all investigative reports, photographs, videos and inventories arising" from the same detention. *Id.* at 12.

The court denied Álvarez's Motion to Suppress with respect to surveillance video recordings of the sales floor, any evidence she sought suppressed on the ground that the government failed to obtain sworn statements from witnesses, and evidence she sought

suppressed because of alleged chain of custody failures. ECF No. 46. The court held in abeyance Álvarez's other arguments pending a suppression hearing. *Id.*

The suppression hearing was held over two days, September 16, 2026, and October 28, 2026. Before the presentation of evidence at the first day of the suppression hearing, the government indicated that it only sought to admit Álvarez's statement in the loss prevention office identifying herself as "Iris M. Álvarez." ECF No. 78 at 7. Defense counsel responded that Álvarez did not have any issue with the admissibility of that statement at trial. *Id.* The Motion to Suppress with regard to any unmirandized statement was accordingly deemed to be moot. *Id.* With respect to a photograph of a 5.11 brand shirt tag that was found within a jacket pocket on a clothing rack, the court ruled that Álvarez did not have standing to seek suppression because Álvarez had either never possessed the tag or had voluntarily abandoned it. *Id.* After the parties briefed the issue, the court ruled that Álvarez had standing to seek suppression of the remaining items. ECF No. 71.

The remaining items for which Álvarez seeks suppression include a photograph of a 5.11 brand shirt for which Álvarez allegedly did not make full payment, a photograph of the price tag attached to the 5.11 brand shirt, and a photograph of the sales receipt for Álvarez's transaction. For the reasons discussed in this Opinion and Order, the Motion to Suppress is DENIED.

## II. Factual Background

Fort Buchanan is a United States Army base in San Juan, Puerto Rico. The AAFES located within Fort Buchanan is a retail store that sells a variety of items, including men's and women's clothing. ECF No. 44 at 3. The AAFES contains a loss prevention office, where civilian "detectives" monitor the premises to protect the store's assets. ECF No. 78 at 24:5–6. The physical loss prevention office, located near the food court and exit of the Exchange, is a small, windowless room containing a desk and two chairs. Hr'g Exs. 8, 9. The entrance door is

locked from the outside but may be freely opened from the inside. ECF No. 78 at 50:19–21; ECF No. 76 at 22:20–21. There is a second door within the loss prevention office that leads to the room where the controls for the Exchange's surveillance system are located. ECF No. 78 at 39:5–6. The surveillance system records silent video footage of the sales floor, food court, and interior of the loss prevention office. *E.g.,* Hr'g Exs. 1–13. The surveillance system allows the operator to pan, tilt, and zoom the camera to obtain a better view of what is being observed. ECF No. 78 at 67:12–14; Hr'g Ex. 1.

Álvarez is a civilian employee at Fort Buchanan. ECF No. 44 at 2. During her lunch break on July 3, 2025, Álvarez went shopping at the Exchange. ECF No. 37 at 2. Álvarez spent some time browsing the sales floor and putting clothing items, including a black Aerosmith shirt from the clearance section and a gray 5.11 brand shirt, into her shopping cart. Hr'g Exs. 1, 2. At 12:33 PM, Álvarez entered a fitting room. Hr'g Ex. 3. After she left the fitting room, she gave the items she apparently did not intend to purchase, including the Aerosmith shirt, to an AAFES employee for restocking. ECF No. 78 at 41:1–3. At 12:40 PM, she was filmed stopping at a clothing rack to look at a blue jacket. Hr'g Ex. 5. She held the jacket and briefly placed her hand in one of the jacket's pockets. *Id.* She then went to the self-checkout area and scanned the items in her shopping cart. When she scanned the gray 5.11 brand shirt, the self-checkout machine registered the item as an "AEROSMITH DREAM ON" shirt. Hr'g Ex. 7; ECF No. 39-28 at 1.

While Álvarez had been shopping, civilian personnel from the AAFES loss prevention department had been monitoring her. Loss prevention detective Julianna Nieves ("Nieves") had been operating the Exchange's surveillance system and noticed Álvarez shopping in a "hot spot," an area containing items that are often shoplifted. ECF No. 78 at 23:8–9, 77:8–12. Nieves watched Álvarez via the cameras, observing her enter and later leave the fitting room. Hr'g Exs. 1–3; ECF No. 78 at 63–64. Nieves notified Loss Prevention Manager Pablo Rodríguez ("LPM

Rodríguez") that she suspected Álvarez had switched the price tags on two shirts. ECF No. 78 at 25:20–22. She was able to relay to LPM Rodríguez the location of the Aerosmith shirt that Álvarez had returned to an employee, and he retrieved it. ECF No. 78 at 40:24–41:3. Nieves then notified him that Álvarez was proceeding through the self-checkout line. ECF No. 78 at 26:1–2.

At 12:45 PM, after Álvarez had completed the self-checkout process and was walking through the food court with her shopping bag, LPM Rodríguez approached her, showed her his identification, and asked for hers. Hr'g Ex. 8; ECF No. 78 at 79:5–10. Álvarez handed LPM Rodríguez her Department of Defense identification and access card that she uses at Fort Buchannan (the "work ID"). Hr'g Ex. 8. LPM Rodríguez gestured towards and verbally invited Álvarez to the loss prevention office. *Id.*; ECF No. 78 at 27:3–5. He then led her on a short walk to the loss prevention office. Hr'g Ex. 8. This entire interaction lasted about thirty seconds. *Id.*

Once Álvarez and LPM Rodríguez were in the loss prevention office, Álvarez placed her shopping bag on the desk. Hr'g Ex. 13. LPM Rodríguez told her that she had been asked to come to the loss prevention office because there was an item in her bag that was "wrongfully scanned on the register and [they] needed to clarify the situation." ECF No. 78 at 27:10–12. He gestured towards the bag, and Álvarez removed a light gray shirt, the dark gray 5.11 brand shirt, and a receipt from it. Hr'g Ex. 13. After inspecting the shirts, the receipt, and her work ID, LPM Rodríguez stated that the 5.11 shirt was incorrectly scanned as a different shirt. *Id.*; ECF No. 78 at 39:17–19. He pointed to the tag attached to the 5.11 shirt and explained that it belonged to the Aerosmith shirt that he was still holding after he retrieved it from the sales floor. Hr'g Ex. 13; ECF No. 78 at 40:24–41:3. He then entered the other room within the office to call the police, taking with him the Aerosmith shirt, the 5.11 brand shirt with tag attached, the sales receipt, and Álvarez's work ID. Hr'g Ex. 13; ECF No. 78 at 41:13–16.

Two uniformed police officers from the Department of the Army, Ian M. Rivera ("Officer Rivera") and Manuel Ortiz ("Sergeant Ortiz"), arrived at 12:53 PM. Hr'g Ex. 13; ECF No. 76 at 8:2–3. LPM Rodríguez opened the door for them, and they proceeded directly into the surveillance control room without speaking to Álvarez. Hr'g Ex. 13; ECF No. 39-28 at 1. While alone in the loss prevention office, Álvarez could be seen using her cell phone and going through her purse. Hr'g Ex. 13. A female uniformed officer, Lieutenant Álvarez, arrived at 12:56 PM and also entered the surveillance room. *Id.*; ECF No. 76 at 8:7–8. Álvarez continued to wait silently and occasionally check her cell phone until 1:04 PM when one of the officers opened the door to the Exchange and let a fourth uniformed officer, Captain Jorge Rodríguez ("Captain Rodríguez"), into the loss prevention office. Hr'g Ex. 13; ECF No. 76 at 8:9–11. Álvarez then waited, apparently unattended, for about ten minutes. *Id.*

At 1:14 PM, Officer Rivera and Sergeant Ortiz reappeared on the surveillance camera. Hr'g Ex. 13. Officer Rivera exited the loss prevention office, and Sergeant Ortiz sat at the desk across from Álvarez. *Id.* Álvarez and Sergeant Ortiz spoke for about a minute before Sergeant Ortiz stood up and left the view of the surveillance camera. *Id.* Álvarez, apparently alone again, picked up her cell phone and put it up to her ear, as if making a phone call. *Id.* After seventeen seconds, she removed the phone from her ear and put it back on the desk. *Id.* At 1:17 PM, Captain Rodríguez then appeared and sat at the desk with Álvarez and began speaking with her. *Id.* While they were still speaking, Captain Rodríguez stood up and opened the door to the loss prevention office, allowing Officer Rivera to reenter the room. *Id.* This time, Officer Rivera brought with him a small stack of papers. *Id.*

At 1:19 PM, Officer Rivera sat at the desk across from Álvarez and began to write on a notepad that contain a preprinted CVB notice form. Hr'g Ex. 13; ECF No. 39-28 at 2; ECF No. 76 at 12:5–7. While he was filling out the form, Captain Rodríguez stood adjacent to the desk.

Hr'g Ex. 13; ECF No. 39-28 at 2. At 1:20: PM, Officer Rivera stood up and retrieved Álvarez's work ID card from the surveillance room. When he returned, he continued to write on his notepad while Captain Rodríguez conversed with Álvarez. *Id.* At 1:21 PM, Officer Rivera said something to Álvarez, and she immediately began to look through her purse and removed another form of identification from her wallet, which she handed to Officer Rivera. *Id.*

At 1:27 PM, Officer Rivera placed the CVB form he had been filling out in front of Álvarez for her signature, but she refused to sign it. Hr'g Ex. 13; ECF No. 39-28 at 2. Shortly thereafter, he took it back. Hr'g Ex. 13. Álvarez then appeared to make a phone call. *Id.* While still on the phone, Officer Rivera handed her a yellow copy of the CVB form, and Captain Rodríguez returned both of her identification cards. *Id.* Both officers gathered their things and left the view of the camera. *Id.* Álvarez hung up her phone call and placed the shirt that was still on the table into the plastic bag. *Id.* Captain Rodríguez returned and handed Álvarez a thin white sheet of paper. *Id.* Finally, she left the loss prevention office and the Exchange. ECF No. 78 at 55:10. Soon after, AAFES staff discovered the 5.11 shirt's original tag in the blue jacket pocket Álvarez was filmed touching. ECF No. 39-7.

## III. Legal Standard

The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. Const. amend. IV. With limited exceptions, it requires police officers and government agents to secure a search warrant supported by probable cause prior to effecting a search or seizure. *United States v. Paneto*, 661 F.3d 709, 713 (1st Cir. 2011). "[A]n individual is seized if 'the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.'" *Hurley v. Curtis*, 189 F.4th 44, 54–55 (1st Cir. 2026) (quoting *Florida v. Bostick*, 501 U.S. 429, 439 (1991)). To determine if a seizure is justified, courts must "consider 'the totality of [the] circumstances.'" *Id.*

(alteration in original) (quoting *Missouri v. McNeely*, 569 U.S. 141, 149 (2013)). "When an unconstitutional seizure occurs, courts enforce the Fourth Amendment's proscription by excluding evidence obtained during said seizure." *United States v. Howard*, 66 F.4th 33, 42 (1st Cir. 2023) (citing *United States v. Camacho*, 661 F.3d 718, 724 (1st Cir. 2011)); *see also United States v. González-Arocho*, 181 F.4th 168, 174 (1st Cir. 2026) (citing *Herring v. United States*, 555 U.S. 135, 139 (2009)).

Police-citizen contact has three levels for Fourth Amendment purposes. The first level, a consensual encounter, allows police to "approach citizens in public spaces and ask them questions without triggering the protections of the Fourth Amendment." *United States v. Young*, 105 F.3d 1, 6 (1st Cir. 1997). The second level, an investigatory (or "*Terry*") stop, occurs when officers "briefly detain an individual for questioning if the officer 'reasonably suspects that the person apprehended is committing or has committed a crime'" under the authority of *Terry v. Ohio*, 392 U.S. 1 (1968), and its progeny. *Camacho*, 661 F.3d at 726 (quoting *Arizona v. Johnson*, 555 U.S. 323, 323 (2009)). Finally, de facto arrest at the third level "occurs when a reasonable man in the suspect's position would have understood his situation, in the circumstances then obtaining, to be tantamount to being under arrest." *United States v. Jones*, 700 F.3d 615, 624 (1st Cir. 2012) (internal quotations omitted).

The quantum of proof necessary for the seizures to be "reasonable" increases with each level. No suspicion is required at the first level. *Young*, 105 F.3d at 6. The second level, as noted, requires reasonable suspicion. *Camacho*, 661 F.3d at 726. "Reasonable suspicion is a concept, not a constant, and defies exact definition." *United States v. Pavao*, 134 F.4th 649, 655 (1st Cir. 2025) (citing *United States v. Chhien*, 266 F.3d 1, 6 (1st Cir. 2001)). It "requires 'more than a hunch, an intuition, or a desultory inkling of possible criminal activity.'" *Howard*, 66 F.4th at 44 (quoting *United States v. Romain*, 393 F.3d 63, 71 (1st Cir. 2004)). "A reviewing court must

consider whether, under the 'totality of the circumstances,' a police officer would have 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Id.* (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)).

The third level must be supported by probable cause. *Young*, 105 F.3d at 6. "Probable cause for an arrest exists when the arresting officer, acting upon apparently trustworthy information, reasonably concludes that a crime has been (or is about to be) committed and that the putative arrestee likely is one of the perpetrators." *Acosta v. Ames Department Stores, Inc.*, 386 F.3d 5, 9 (1st Cir. 2004) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964) and *United States v. Figueroa*, 818 F.2d 1020, 1023 (1st Cir. 1987)). "Probable cause is 'a fluid concept' and 'not a high bar.'" *Karamangolu v. Town of Yarmouth*, 15 F.4th 82, 87 (1st Cir. 2021) (first quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983); and then quoting *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018)). The existence of probable cause for an arrest "is determined by viewing the totality of the circumstances from the perspective of an objectively reasonable officer." *Id.* (citing *Maryland v. Pringle*, 540 U.S. 366, 371 (2021)). b

"Because a *Terry* stop allows an individual to be seized on less than probable cause, the extent of that intrusion must be limited." *United States v. Pontoo*, 666 F.3d 20, 30 (1st Cir. 2011) (citing *United States v. Acosta-Colón*, 157 F.3d 9, 14 (1st Cir. 1998)). When the intrusion exceeds its limits, "the stop may evolve into a de facto arrest." *United States v. Rabbia*, 699 F.3d 85, 91 (1st Cir. 2012) (citation omitted). That being said, there is no "litmus-paper test for distinguishing" between the three levels. *Florida v. Royer*, 460 U.S. 491, 506 (1983).

> Instead, we inquire, in light of the totality of the circumstances, whether a reasonable person in the suspect's position would have understood her position as being tantamount to being under arrest. This objective, suspect-focused inquiry is informed by our assessment of the reasonableness of the detaining officer or officers' actions in response to developing conditions. Where an investigatory stop is justified at its inception, it will generally not morph into a de facto arrest as long as the actions undertaken by the officer[s] following the stop were reasonably

> responsive to the circumstances justifying the stop in the first place as augmented by information gleaned by the officer[s] during the stop.

*Rabbia*, 699 F.3d at 91 (alterations in original) (quoting *United States v. Chaney*, 647 F.3d 401, 409 (1st Cir. 2011)). A de facto arrest, like a traditional arrest, requires probable cause. *United States v. Rasberry*, 882 F.3d 241, 246–47 (1st Cir. 2018) (citing *Chaney*, 647 F.3d at 408).

## IV. ANALYSIS

Álvarez contends that her Fourth Amendment rights were violated because she was unlawfully detained, and that her detention turned into an unlawful de facto arrest. Accordingly, she asks the court to apply the exclusionary rule and suppress photographs of the 5.11 brand shirt, the price tag attached to it, and her sales receipt.

First, Álvarez alleges she was detained when LPM Rodríguez approached her in the food court just after she had gone through the self-checkout. ECF No. 37 at 5. She characterizes the interaction as a "forceful seizure," but the video surveillance footage and witness testimony point to an interaction much closer to a traditional consensual encounter. LPM Rodríguez applied no physical force to Álvarez's person. He did not touch or grab her to get her attention or stop her from walking. The surveillance footage indicates that he said something to her, causing her to stop, turn around, and face him. Hr'g Ex. 8. At that point, he displays his identification, asks for hers, and she hands it to him. ECF No. 78 at 79:5–10. Immediately, he invites Álvarez to the loss prevention office and begins to lead her to the loss prevention office for about fifteen seconds. Hr'g Ex 8; ECF No. 78 at 87–88. Moreover, LPM Rodríguez was unarmed and dressed in civilian clothing—a blue short-sleeve shirt, blue jeans, and a hat. Hr'g Ex. 8; ECF No. 78 at 36:18–19. Nothing about this interaction suggests that Álvarez was coerced or otherwise performed any actions involuntarily. Thus, at this point, Álvarez was not detained.

Still, even if this was not a consensual encounter and Álvarez was detained once LPM Rodríguez spoke to her in the food court, the loss prevention employees, to the extent they are state actors,[1] had reasonable suspicion that Álvarez had shoplifted goods. The surveillance cameras were able to observe Álvarez inspect and put in her shopping cart both the Aerosmith shirt and the 5.11 shirt before she entered the fitting room. After she left the fitting room and returned the Aerosmith shirt to a sales associate, the cameras showed Álvarez quickly put her hand in the pocket of a blue jacket on a clothing rack. Finally, the cameras show that the 5.11 shirt, when scanned, rang up as the Aerosmith shirt. The text on the self-checkout display is legible from the surveillance footage. Hr'g Ex. 6 (12:42:51 PM). These facts, taken together, show that AAFES detectives had "more than a hunch, an intuition, or a desultory inkling of possible criminal activity," *Romain*, 393 F.3d at 71, when Álvarez was approached by LPM Rodríguez.[2]

Next, Álvarez argues that she was detained and subject to a de facto arrest when she was in the "isolated, police-dominated Loss Prevention Booking Office" and that her "egress [was prevented] from within." ECF No. 37 at 6. Once in the loss prevention office, LPM Rodríguez apparently asked Álvarez to remove the shirts and receipt from her shopping bag.[3] After

---

[1] The Fourth Amendment "proscrib[es] only governmental action." *United States v. Jacobsen*, 466 U.S. 109, 110 (1984). A military court has held in one case that an AAFES detective "in a very real and substantial sense acted as an instrument of the military" during a shoplifting investigation. *United States v. Quillen*, 27 M.J. 312, 315 (C.M.A. 1988). Moreover, LPM Rodríguez testified at the suppression hearing that he and everyone else that works at the Exchange are employees of the federal government. ECF No. 78 at 28:5–15. Still, the court does not need to find that AAFES detectives are state actors for Fourth Amendment purposes because even assuming that they are, as explained below, Álvarez's rights were not violated.

[2] The fact that LPM Rodríguez had not yet seen the surveillance footage is immaterial. "In assessing reasonable suspicion, we look to the collective information known to the law enforcement officers participating in the investigation rather than isolating the information known by the individual officer who conducted the stop." *United States v. Amado*, 157 F.4th 87, 95 (1st Cir. 2026) (citation modified) (quoting *United States v. Cruz-Rivera*, 14 F.4th 32, 44 (1st Cir. 2021)).

[3] Although this exchange was recorded by the video surveillance system, the videos do not contain audio. Therefore, it is difficult to know the manner by which LPM Rodríguez asked Álvarez to produce the items in her shopping bag. Still, the surveillance footage shows LPM Rodríguez gesturing to the bag, and Álvarez immediately looking through it. The footage is consistent with her complying with a request, and no testimony or other evidence to the contrary has

comparing the 5.11 shirt, the attached tag, the Aerosmith shirt, and the receipt, LPM Rodríguez decided to notify the police, and stepped into the surveillance control room to do so.

By this point, Álvarez had only been told that an item had been wrongfully scanned. LPM Rodríguez had not taken any action that indicated she was not free to leave. She had not been told that the police were on their way or that she was not permitted to leave. She had not asked or attempted to leave the loss prevention office. She was never physically restrained; only an unlocked door (from the inside) was between her and the exit of the Exchange. Hr'g Ex. 13; ECF No. 78 at 38:16–19. She did not ask for her work ID to be returned to her. Moreover, while her work ID was with LPM Rodríguez in the surveillance room, this did not stop her from leaving. Unlike in *Florida v. Royer*, 460 U.S. 491 (1983), where the police retained the defendant's driver's license and airline ticket, rendering him unable to leave the airport, Álvarez's work ID was not required for her to leave the loss prevention office. Testimony at the suppression hearing suggested that the work ID was necessary to go through certain doors so an employee could go to work (ECF No. 78 at 80:20–21), and the work ID is most likely necessary to enter Fort Buchanan in the first place. However, these facts do not bear on her ability to "terminate the encounter," *Bostick*, 501 U.S. at 439; she was still permitted to leave the loss prevention office.

The mere presence of the uniformed Department of the Army police officers, as Álvarez argues (ECF No. 37 at 6), similarly did not result in her detention. For Álvarez to have been seized, the actions or words of law enforcement must cause her to reasonably believe that she is not free to leave. *Hurley*, 189 F.4th at 54–55; *Brendlin v. California*, 551 U.S. 249, 254 ("A person is seized by the police when the officer, by means of physical force or show of authority,

been introduced to show that she was ordered to open the bag against her will. Like the interaction in the food court, there is no evidence of physical force or other coercion.

terminates or restrains his freedom of movement *through means intentionally applied*." (emphasis in original) (citation modified)). However, officers did not interact with Álvarez when they arrived—they all walked straight past her to the surveillance control room. Hr'g Ex. 13. Indeed, Officer Rivera stated in a sworn statement that when he and Officer Ortiz entered the loss prevention office, they intentionally "refrained from speaking to [Álvarez] before [they] could ascertain the situation." ECF No. 39-28 at 1. She was left in the loss prevention office alone for ten minutes, where she silently waited and checked her cell phone. Hr'g Ex. 13. No facts indicate the presence of physical force or a show of authority that would have limited Álvarez's freedom of movement.

After the officers emerged from the surveillance control room, Sergeant Ortiz sat at the desk across from Álvarez and began to speak with her. The video recording, which has no audio, shows Álvarez gesturing with her hands, holding up the light gray shirt that was still on the desk, and manipulating the shirt's price tag with her hands. Hr'g Ex. 13. It is at this point, when police begin to discuss the incident with her after having reviewed evidence, that Álvarez was, for the first time, speaking with an armed, uniformed police officer about the details of related to a "wrongfully scanned" item. ECF No. 78 at 39:19. A reasonable inference can be made that she was aware that two other uniformed officers were in the adjoining room, and she had just seen Officer Rivera exit the loss prevention office. Now, this is more analogous to an investigatory stop where officers engage with a suspect to "verify or dispel their suspicions." *Royer*, 460 U.S. at 502. The manner in which the scene played out bolsters this conclusion: officers arrived and analyzed evidence, then spoke to Álvarez to shed light on that evidence. Having had enough information to draw a conclusion, the officers issued her a CVB notice, returned her identification cards, and she left.

The next question is whether the police officers had reasonable suspicion, or "a particularized and objective basis for suspecting" that Álvarez committed a crime at the time she was detained. *Cortez*, 449 U.S. at 417–18. The record suggests that they did. Upon entering the loss prevention office, each police officer entered the surveillance control room. Hr'g Ex. 13. There, the AAFES detectives showed officers the Aerosmith shirt, the 5.11 shirt, the tag attached to the 5.11 shirt, and the sales receipt and allowed them to view the surveillance footage. ECF No. 76 at 11:20–21. The surveillance footage shows that Álvarez's self-checkout terminal recorded that she had purchased an "AEROSMITH DREAM ON" shirt, but she did not have that shirt in her shopping bag when she left the self-checkout. Hr'g Exs. 6, 22. Instead, she had a gray 5.11 brand shirt with a red clearance sticker that appeared to belong to the Aerosmith shirt. ECF No. 78 at 40:3–5; ECF No. 76 at 23:2–5; Hr'g Ex. 13. The surveillance footage appears to show Álvarez shopping in the store and putting both the 5.11 brand shirt and the Aerosmith shirt from the clearance section in her cart. Hr'g Exs. 1, 2. It then shows her entering the fitting room and leaving a few minutes later, handing the Aerosmith shirt to an associate. Hr'g Ex. 3; ECF No. 78 at 64:1–5.[4] Afterwards, it shows her quickly putting her hand in the pocket of a jacket. Hr'g Ex. 5. Finally, the surveillance footage shows that when scanning her goods, the self-checkout display registered the 5.11 brand shirt she scanned as an "AEROSMITH DREAM ON" shirt. Hr'g Ex. 7; ECF No. 39-28 at 1. This evidence gave officers "more than a hunch" that criminal activity had occurred.

Álvarez's detention by police in the loss prevention office, however, did not rise to the level of a de facto arrest. The circumstances called for an investigatory detention and the officers acted accordingly. It is true that she was in the loss prevention office for about forty-five

[4] Surveillance footage of Álvarez leaving the fitting room existed but was not preserved by the government. ECF No. 39 at 17. Officer Rivera confirms that he saw that footage before it was erased. ECF No. 39-28 at 1.

minutes, but much of this time was before police arrived and began to speak with her. It is also true that the known presence of four uniformed and armed police officers also makes the situation appear closer to a traditional arrest. On the other hand, the signs of an arrest were not present. Álvarez was not physically restrained with handcuffs or otherwise. She was not patted down or searched. The officers did not draw their service weapons or tasers. The officers did not tell Álvarez that she was under arrest. She never asked to leave. The door to the Exchange was unlocked from the inside. And in the end, she was let go. The officers' conduct in this case is instead limited to being present and speaking with Álvarez about the possible commission of a crime. The absence of additional factors shows that the responding officers' actions were justified in light of the situation. Looking to the totality of the circumstances, Álvarez was not subject to a de facto arrest.

## V. CONCLUSION

For the reasons discussed above, the intervention with Álvarez at the loss prevention office on July 3, 2025, has not been shown to have violated her Fourth Amendment Rights. Thus, there is no occasion to invoke the exclusionary rule. Accordingly, the Motion to Suppress the photographs of the 5.11 shirt, the price tag attached to it, and the sales receipt is DENIED.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 20th day of November 2026.

s/Marcos E. López
U.S. Magistrate Judge